# UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF TEXAS

**DAVID J. BRADLEY**
CLERK OF COURT

P.O. BOX 61010
HOUSTON, TEXAS  77208

October 7, 2014

Dr. Kenneth Eugene Lehrer
5555 Del Monte Drive
Residence 802
Houston, TX  77056

Re:   *Securities and Exchange Commission vs. Robert L. Sonnfield, Jr., et. al.*
      Case No. 4:08-cv-2351

Dear Dr. Lehrer:

 Your correspondence regarding the above-referenced case and addressed to The Honorable Ricardo H. Hinojosa, Chief Judge, dated October 1, 2014, has been referred to me.  A Chief Judge of a United States District Court lacks the authority to implement your suggested extra-ordinary measures.  I have been directed to forward your correspondence to the presiding judge in the case, United States District Judge Lynn N. Hughes.

 Sincerely

 David J. Bradley

### DR. KENNETH EUGENE LEHRER

*5555 Del Monte Drive – Residence 802 – Houston, Texas 77056*

HOME  (713)  626-8184      OFFICE  (713)  972-7912      FAX  (713) 964-0444

*e-mail: DRKEN@LEHECOSERV.com    web site:  WWW.LEHECOSERV.com*

October 1, 2014

The Honorable Ricardo H. Hinojosa, Chief Judge
United States District Court
1701 West Business Highway 83  -  Room  1011
McAllen, Texas  78501

> **RE:  Securities  and  Exchange  Commission  vs.  Robert
> L. Sonfield, Jr.; Jason Landess, et al; Case No. 4:08-
> cv-02351 In the United States District Court For the
> Southern District of Texas, Houston Division.**

Dear Judge Hinojosa:

Based upon the ole theory that if citizens want good, honest and active government they must also take an active role, this letter is written in the hope you will give it some solid attention and ponder a positive course of action.

In simple and succinct terms, in <u>July, 2008</u>, over six (6) years ago, the Securities and Exchange Commission ("SEC") filed litigation against two (2) very senior, knowledgeable, but unethical attorneys - Robert L. Sonfield Jr. (Houston, Texas) and Jason Landess (Las Vegas, Nevada) in regards to their scam of "creating" a company via a reverse merger and then selling significant public securities to a broad base of unsuspecting older and middle class individuals.  Openly, they sold "penny stock" into a corporation that had no product, had not tested any product(s), did not have a "white paper" on any product(s) and had no corporate fundamentals other than to raise money from selling their "own" created shares, expense the funds (partly on themselves and their friends) and then declare the company "broke" and unable to complete its mission (there was no real mission - as there was no conceivable product).  Having been offered a participation into this "enterprise" I can unequivocally state, like I did during a visit (2007) with the SEC in Ft. Worth - it was a very clever and well planned "scam" by a senior (older) group of significantly experienced corporate and securities attorneys and executives.  Concisely it was their - "retirement plan."  The matter was thoroughly investigated by the Ft. Worth office of the SEC in regards to Exobox (the official corporate name of the "venture") and the attached **Exhibit "A"** was filed by the Commission in 2008.  Sadly and most unfortunately, as both the scammers and the victims age, the matter has NOT moved forward.  As a person who worked his way through college at the New York University ("NYU") Library, I commenced some additional research, both on my own and in speaking with significant other parties who undertake legal research.  The results are astounding and are attached via a reduced copy of the *Texas Lawyer – January 13, 2014.*

RE: LETTER TO – THE HONORABLE RICARDO H. HINOJOSA, CHIEF JUDGE
UNITED STATES DISTRICT COURT - MCALLEN, TEXAS
CONTINUED ...../.....

PAGE 2.

The SEC / Exobox case is in front of Judge Lynn Hughes who has, by far, the largest amount of motions pending for over six (6) months. As noted in the *Texas Lawyer (*see **Exhibit "B"***)*, Judge Hughes has more motions pending over six (6) months than all of the other Judges in your circuit combined. The article notes -- *"U.S. District Judge Lynn Hughes had 10 civil cases pending on his docket for more than 10 years and 81 motions pending for more than six months."*

I trust your receipt of my research (also see **Exhibit "C"**) pages from the "stalled" case from PACER, denotes my output as – appropriate, scholarly and presented in a timely manner. While it is NOT my place to "suggest" to a District Chief Judge how to operate his District or Circuit, or to list or even speculate as to why the Exobox matter has not moved forward, I can only request on behalf of many modest income and now ageing persons that you implement some "extra-ordinary" motion, such as a request for change of Judge or a Mandamus (of some form), based upon the advancing ages of Mr. Sonfield and Mr. Landess and the well researched matter of Exobox by the Securities Commission (2005 – 2008). This "valuable" matter might never be brought to trial (age, death or senility of the defendants) and these "persons" will have clearly gotten "away with murder" and be able to pass along to their heirs, significant amounts of "ill gotten funds" to the solid detriment of many - fine law abiding and hard working individuals:

Can you please help *them*???   (I did not lose any funds [not a cent] in this "scam").

Since it is rather scholarly, that a researcher who raises a problem should also offer a solution, I could suggest you transfer this case from Judge Hughes to Judge Sim T. Lake or another Justice of similar superior quality. These two gentlemen are "friends" attend the same Church (St. Martin's Episcopal in Houston, where I am one of the head ushers) and it could be denoted as a small effort by the District to assist Judge Hughes based upon the heavy burden of his docket. As you might recall, Judge Lake contributed a great deal in the Enron litigation and in his fine handling of the Jeff Skilling matter. Here, Judge Lake resolved several conflicts and levels of appeals and earned the respect of an entire community especially in regards to corporate securities and securities fraud matters. Thus, Judge Hughes should not object and might even admire and welcome such help in respect to his document management.

Thank you for taking your time to read and review the above and attached. If you have any questions or desire or suggest I undertake additional "volunteer" efforts for your

RE: LETTER TO – THE HONORABLE RICARDO H. HINOJOSA, CHIEF JUDGE
UNITED STATES DISTRICT COURT - MCALLEN, TEXAS
CONTINUED ...../.....

PAGE 3.

decision making process, or want to offer any feedback or directions for additional input, please feel free to call upon me at any time.

Best regards.

Respectfully submitted,

DR. KENNETH EUGENE LEHRER

KEL:lm

Attachments (3 Exhibits)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| vs. | : **COMPLAINT** |
| | : Civil Action No. |
| ROBERT L. SONFIELD, DONALD C. BRADLEY, JEFFREY W. BRADLEY, JASON LANDESS, MARC LANE, ROGER BREWER, | : |
| Defendants, | : |
| And | : |
| ALEXANDERIA K. BLANKENSHIP | : |
| Relief Defendant. | : |



EXHIBIT A

**COMPLAINT**

Plaintiff United States Securities and Exchange Commission alleges as follows:

**SUMMARY**

1.    This case arises from an international unregistered, nonexempt distribution of over 10.8 million shares of the common stock of Exobox Technologies Corporation, a company based in Houston, Texas. This scheme, which involved a variety of violations of the federal securities laws, allowed the Defendants to collectively reap proceeds exceeding $3.91 million.

2.    In June 2005, Defendants Jason Landess, a Nevada attorney, Jeffrey W. Bradley and Donald C. Bradley conveyed control of Kilis, Inc. to Defendant Robert L.

Sonfield, a Houston-area attorney, who was to then orchestrate a reverse merger between Kilis and one of Sonfield's privately-held clients. Specifically, Landess and the Bradleys delivered to Sonfield all of Kilis's business records, including its stock certificate book and all of the outstanding common stock certificates of Kilis, together with sham "stock powers" in exchange for Sonfield's agreement to orchestrate the reverse merger and provide them with 10% of the common stock of the public entity resulting from the reverse merger. During the period in which Sonfield possessed Kilis's certificate book, several unpaid, backdated Kilis certificates were issued to incorrectly reflect that they could be traded under exemptions to the registration provisions of the federal securities laws.

   3.  In September 2005, Sonfield and Defendants Marc Lane, a British citizen believed to reside in Cadiz, Spain, and Roger Brewer, a British citizen believed to reside in Penzance, England, engineered a reverse merger between Kilis and one of Sonfield's privately-held clients, a Delaware corporation known as Exobox. Following the merger, Sonfield, Lane and Brewer controlled virtually all of the putatively "free trading" public "float" of Exobox common stock. They then arranged, from approximately late 2005 through at least April 2007, for the transfer and sale of the vast majority of those shares into the public market through "grey market" sales, reaping collective proceeds of $3.91 million. During this process, Relief Defendant Alexanderia Blankenship, through her personal relationship with Sonfield, received approximately $647,000 in proceeds.

   4.  Sonfield substantially contributed to these transactions by, for example, causing most of the post-merger Exobox shares to be distributed to the offshore entities controlled by Lane and Brewer. He also authored an opinion letter falsely stating that the

shares, with minor exceptions, were freely tradable without registration in accordance with the registration exemptions found in Rule 144 under the Securities Act of 1033 ("Securities Act").

5.      In addition, in late 2005, Sonfield prepared and filed, on behalf of Exobox, multiple required public filings with the Securities and Exchange Commission that omitted the material fact that he, Lane and Brewer controlled almost all of the company's public float.

6.      Because of these material omissions, Sonfield violated the antifraud provisions of the federal securities laws and aided and abetted violations of the reporting provisions of the federal securities laws.

7.      Sonfield, Lane and Brewer also violated the reporting and disclosure requirements of the Securities Exchange Act of 1934 ("Exchange Act") by not disclosing their control of Exobox holdings.  Finally, all the Defendants violated the registration provisions of the Securities Act through their involvement in these unregistered transactions.

8.      The Commission, in the interest of protecting the public from further violations of the federal securities laws, brings this action seeking an order permanently enjoining Defendants from violating and aiding and abetting violations of certain of the federal securities laws, imposing civil monetary penalties and disgorgement of ill-gotten gains, plus pre-judgment interest, and issuing a penny stock bar against each Defendant. The Commission further seeks an order requiring Relief Defendant Blankenship to disgorge any proceeds that she received and that are derived from the Defendants' improper conduct.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §

78aa]. Defendants have, directly and indirectly, made use of the means or

instrumentalities of interstate commerce and/or the mails in connection with the

transactions described in this Complaint.

10.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain

of the acts and transactions described herein took place in the Southern District of Texas

and Defendant Sonfield resides in the Southern District of Texas.

## DEFENDANTS

11.     Robert L. Sonfield, 76, of Houston, Texas, is an attorney, licensed by the

State Bar of Texas, whose practice generally focuses on the representation of small public

companies.  He engineered the reverse merger between Exobox's privately-held

predecessor company and Kilis, putatively as counsel for Exobox.  He also represented

Exobox as counsel in connection with its Exchange Act registration and filings.  Exobox

dismissed Sonfield as its securities counsel in 2007.

12.     Donald C. Bradley, 76, of Las Vegas, Nevada, organizes and sells shell

companies.  He organized and controlled the shell company Kilis, Inc. up until its reverse

merger in 2005 with Exobox's privately held predecessor.

13.     Jeffrey W. Bradley, 48, of Las Vegas, Nevada, is Donald Bradley's son

and he assists his father in his shell organization and sales business.  Jeffrey Bradley

helped his father organize Kilis, convey that shell to Sonfield, and negotiate his and his father's receipt of putatively unrestricted Exobox common shares.

14.     Jason Landess, 62, of Las Vegas, Nevada, an attorney licensed by the State of Nevada, introduced the Bradleys to Sonfield and participated in the resulting distribution of Exobox shares by, among other things, helping to arrange for the transfer of all of the outstanding Kilis common shares to Sonfield in connection with Kilis' merger with Exobox and the later distribution of Exobox shares to himself and the Bradleys.

15.     Marc Lane and Roger Brewer controlled nine offshore entities that purport to share addresses in either Hong Kong or Nevis.  Lane, 46, believed to reside in Cadiz, Spain, is a British citizen, and Brewer, 52, is a British citizen believed to reside in Penzance, England.  The entities controlled by Lane and Brewer received approximately 8.5 million Exobox shares from Sonfield, which Lane and Brewer later caused to be deposited into and then sold through U.S. brokerage accounts held in the name of the offshore entities.

## RELIEF DEFENDANT

16.     Alexanderia Blankenship, 46, of Houston, Texas, is a personal acquaintance of Sonfield who received Exobox shares for no apparent consideration following its reverse merger.  Ultimately, those shares were sold in unregistered nonexempt transactions for proceeds approximating $647,000.

## FACTS

### *Original Sham Kilis Share "Issuance"*

17.     On or about December 8, 1999, Donald and Jeffrey Bradley incorporated Kilis to engage in a merger or other business combination in the unspecified future. Kilis never conducted any business operations.

18.     On or about January 10, May 1 and June 15, 2000, the Bradleys caused Kilis, without the benefit of any transfer agent, to issue 22 certificates representing 1,915,000 shares of Kilis common stock ("founders' certificates"). The Bradleys, who prepared the certificates, did not encumber the certificates with restrictive legends -- restrictions that would have correctly warned against reselling the shares into the public market place unless the sale was exempt from the SEC's registration requirements -- and caused them to be issued to nominees, including six members of the Bradleys' family, who paid no consideration for the stock, did not receive the certificates, and who were for the most part not even aware that a Kilis stock certificate had been issued in their name.

19.     Notably, the Bradleys doctored portions of Kilis' corporate records to falsely indicate that certain nominees had paid consideration for the shares and attended at least some annual meetings. In reality, the Bradleys retained control and possession of the 22 founders' certificates until they delivered them to Sonfield in June 2005, having obtained at or near the time of issuance signed stock powers for all 22 founders certificates that purported to allow the Bradleys to transfer title of the stock. Each of the stock powers had signature medallion guarantees, but at least one of those medallions was a counterfeit and several signatures were forged. The transferee line on each stock

Complaint
*SEC v. Sonfield, et al.*                                                    Page 6

power was left blank, making the attached stock certificates freely negotiable by the Bradleys and Sonfield.

### *Sonfield Acquires Control of the Original, and Additional, Kilis Shares*

20.     Having been introduced to Landess by a mutual business associate at the end of 2004, Sonfield informed Landess in early 2005 that he and certain unnamed partners were interested in purchasing a shell company for a possible reverse merger with a private company.  Shortly thereafter, Landess introduced Sonfield to the Bradleys, who Sonfield understood controlled corporate shells that might merge with one of his private company clients.

21.     In early June 2005, Sonfield proposed to Landess and the Bradleys that Kilis merge with one of Sonfield's clients, a privately held company known as JinPin, Inc.  Landess and the Bradleys agreed that the Bradleys would deliver all of the original Kilis certificates to Sonfield in exchange for 10% of the stock in the company resulting from the reverse merger and, under the terms of the agreement, the 10% shares received back were to be "free trading."  Separately, the Bradleys and Landess agreed with each other that Landess would receive half of the 10% of post-merger shares for his role.

22.     In accordance with this agreement, in June 2005, Sonfield took physical possession of the Kilis corporate documents, including the original 22 Kilis certificates, the accompanying stock powers, and a book of remaining blank stock certificates, signed by the Bradleys.  Prior to this transfer, the Bradleys had maintained control of the 22 certificates, notwithstanding the bogus "distribution" in 2001.  After receiving the Kilis certificates, Sonfield made no attempt to contact any of the Kilis shareholders to determine whether they were bona fide shareholders of Kilis.  Nor did Sonfield ever

provide any consideration to the Kilis shareholders for the receipt of their Kilis certificates.

23.     The agreement between Sonfield and the Bradleys was memorialized on or about June 27, 2005 in a written document signed by Jeffrey Bradley on behalf of an entity he and Donald Bradley controlled and Sonfield, on behalf of his law firm.  The written document confirmed that the Bradleys were to transfer "the necessary business records of [Kilis] to Sonfield," including, "the Stock Register and/or original stock certificates, etc." The agreement also provided that Sonfield would hold the documents in escrow and "should the contemplated merger (or an agreed-upon substitute transaction) not be completed within ninety (90) days," Sonfield would return the documents to the Bradleys.  Landess helped orchestrate and memorialize this agreement, which was sent via facsimile between Sonfield and Landess.  No registration statement was filed or in effect regarding this securities transaction between Sonfield and the Bradleys and Landess.

24.     During this time period in June 2005, additional Kilis shares were issued, and, again, there was no registration statement filed or in effect regarding these transactions.  First, Landess requested that a portion of the shares owed to him pursuant to the agreement described above be issued in the name of his step-brother.  In response to this request, a certificate representing 100,000 shares was issued in the name of Landess' step-brother.  However, Landess' step brother paid no consideration for the shares and never received them.  Instead, Sonfield retained control over the certificate, having requested and received a blank stock power signed by the step-brother that, in effect, made the certificate freely negotiable.  Ultimately, Sonfield arranged for these

shares to be transferred to an off-shore entity controlled by Lane and Brewer. Landess was aware that his step-brother had putatively received shares but had paid no consideration for those shares and had, in essence, left control of those shares with Sonfield.

25.     Also in June 2005, two other Kilis certificates were issued:  the second for 100,000 shares to Sonfield's then-legal assistant and the third, representing 300,000 shares, to the an individual who had putatively been appointed as JinPin's principal. The shares issued to the legal assistant ultimately were conveyed by Sonfield to Lane and Brewer, through one of the offshore entities they controlled.

26.     Each of these newly-issued certificates was issued without restrictive legends, and – although issued in 2005, each was falsely backdated to reflect an issuance date of March 1, 2003. Backdating the issuance to March 1, 2003 was intended to, and did, facilitate prompt re-sale of the stock, purportedly under the Rule 144(k) safe harbor from registration, by falsely reflecting that the three new shareholders held the shares for at least two years, a holding period required to fit within the Rule 401(k) registration exemption. None of these new putative "shareholders" paid any consideration for their Kilis shares.

27.     In or about June 2005, in connection with the proposed transaction and pursuant to Sonfield's instructions, Landess made filings with the Nevada Secretary of State reporting Kilis had changed its name to JinPin and that the principal of JinPin, a Canadian resident ("the JinPin principal"), had become Kilis' sole officer and director. However, the JinPin merger never closed, and Sonfield retained control of virtually all outstanding Kilis shares.

### *Kilis Reverse Merges with Exobox*

28.     In or about August 2005, Sonfield – while still in control of the Kilis stock

certificates – began representing Exobox, at that time still a privately-held company.

Sonfield introduced a representative of Exobox *via* a telephone conference call to Lane

and Brewer, explaining to the Exobox representative that Lane and Brewer controlled a

shell company known as JinPin (i.e., Kilis) that was a potential reverse merger candidate.

Sonfield failed to inform Exobox's representatives the details regarding his earlier

transactions with Landess and the Bradleys, including the fact that he had received

control of Kilis from the Bradleys and that he, in fact, retained control of those shares.

29.     In the telephone conference, the parties discussed a potential reverse

merger.  Lane and Brewer told the Exobox representative that they could provide Exobox

with a "clean public shell," $500,000 in cash and payment of the expenses associated

with the reverse merger, including accounting fees and Sonfield's legal expenses, in

exchange for a total 5% equity interest in the surviving company.  Again, Sonfield never

disclosed his agreement with the Bradleys and Landess, nor did he disclose that upon the

completion of the reverse merger, he would control virtually all of Exobox's outstanding

common stock since he controlled the original 22 Kilis founders' certificates and at least

two of the certificates that were issued in 2005 (but that had been backdated to falsely

reflect a 2003 issuance date).  Relying on Sonfield's advice, Exobox's officers agreed to

a reverse merger with JinPin.

30.     Sonfield, putatively on behalf of Exobox, prepared all of the documents to

complete the merger transaction, while Landess wrote an opinion letter in which he

claimed to represent Kilis' successor, JinPin, in the merger.  Landess also assisted in the

reverse merger by assisting the auditors. Although Lane and Brewer had represented to Exobox that they would pay auditor expenses associated with the reverse-merger, those expenses were ultimately paid from Sonfield's account.

31.    In fulfillment of their offer to Exobox, an off-shore entity controlled by Lane and Brewer entered into an agreement with Exobox to purchase 20,000 shares of Exobox Class C convertible preferred stock for $500,000. The preferred stock represented the 5% equity interest negotiated by Lane and Brewer for providing the shell and paying various fees. During the same time period, JinPin (i.e., Kilis) approved a 4.5:1 forward split of its outstanding common stock, which increased its outstanding shares of common stock to 10,867,500. The merger closed on September 15, 2005.

32.    As part of the merger, the officers and directors of privately-held Exobox received convertible preferred stock that had conversion terms and voting rights that left them in voting control of the entity that survived the merger. While those officers and directors maintained voting control over the entity's business activities, Sonfield, at the time of and shortly following the merger transaction controlled over 88% of the surviving entity's "public float." As a result, these shares were control shares and restricted securities.

33.    Nevertheless, in October 2005, Sonfield took steps to facilitate the public trading of the stock of the surviving, now-public, company, Exobox. For example, on or about October 7, 2005, Sonfield prepared and submitted a tradability opinion letter to the Pink Sheets, LLC (as it was then known) and to Exobox's transfer agent. In the letter, Sonfield set out his opinion that, as of the date of the letter, virtually all of the shares, including those issued to the Bradleys, "may be sold immediately in the public market by

the holders thereof, without registration under the Securities Act in reliance on the safe

harbor of Rule 144(k) under the Securities Act." Sonfield did not disclose that, in reality,

nearly all of the remaining 10,867,500 shares of common stock were controlled by him

and Lane and Brewer, not the putative nominees. Although Sonfield's opinion letter was

subsequently posted on the Pink Sheets website, Exobox was not accepted for quotation

and its shares traded via unsolicited quotes published in the Over-the-Counter Bulletin

Board.

34.     On or about October 14, 2005, Exobox's common stock began grey

market trading at $1.50 per share on volume of 1,900 shares. The grey market is a

market for a security in which there are no market makers or broker-dealers transacting in

the security for their own accounts.

35.     From mid-January to the end of February 2006, Exobox's share price

increased from $1.60 to a high of $22.00 and stabilized at approximately $15.00, on very

limited volume.

### Sonfield's Unregistered, Nonexempt Distribution of Exobox Shares

36.     In or about September 2005, Sonfield's legal assistant received the

unsolicited and unpaid for Kilis stock certificate issued in her name, representing 450,000

post-split Exobox shares. When she pointed out to Sonfield that the certificate falsely

reflected a March 1, 2003 issuance date, Sonfield told her "not to worry about it" and

instructed her to deposit the certificate in her brokerage account.

37.     On or about October 15, 2005 – the date on which Exobox's shares began

grey market trading – Sonfield began directing his legal assistant to sell the Kilis shares

issued in her name, which she had, in accordance with Sonfield's instructions, deposited

into her brokerage account and which had subsequently been converted into 450,000 post-split Exobox common shares.  From October 14, 2005 to mid-January 2006, Sonfield directed or was aware of the sales of 12,200 Exobox shares from his legal assistant's account for total gross proceeds of approximately $19,600.

38.     In or about January 2006, Sonfield told his legal assistant that he was merely "parking" the Exobox shares in her account and that they actually belonged to Lane and Brewer.  At that point, she asked Sonfield to remove the shares from her account.  Shortly thereafter, on or about January 17, 2006, Sonfield directed his legal assistant to transfer the remaining 437,800 shares of Exobox common stock and $18,829 in Exobox proceeds from her account to a brokerage account in Blankenship's name, over which Sonfield had written, discretionary trading authority.  This was not the first time that Sonfield used accounts in Blankenship's name to transfer securities and make use of subsequent trading proceedings.  For example, in July 2005, as part of a transaction that does not appear related to the Exobox matter, Sonfield directed the transfer agent of another company to issue shares of that company in Blankenship's name and then deposited the certificate into a Blankenship's brokerage account.  Ultimately those shares were sold into the market for proceeds of roughly $73,000, a portion of which Sonfield then used to pay certain of the issuer's consulting expenses.

39.     From January 18 to February 14, 2006, Sonfield or Blankenship, with Sonfield's knowledge or direction, sold approximately 68,996 shares of Exobox shares from her account, reaping total gross proceeds of $628,486.

40.     On or about January 24, 2006, Sonfield, or Blankenship on his behalf, at his direction or with his knowledge, transferred $25,000 of these proceeds from Blankenship's brokerage account to Landess.

41.     From February 2 to February 21, 2006, wire transfers totaling $616,027 were made from Blankenship's brokerage account to a Houston bank account in her name.  Of those funds, approximately $607,977 was, shortly thereafter, transferred to a bank account in the name of an offshore entity controlled by Lane and Brewer.  Later, in March and May 2007, after Sonfield and Blankenship learned of the Commission's investigation in this matter, approximately $621,570 was returned to Blankenship's bank account.

42.     Following that transfer, over the next several months Blankenship spent roughly $375,000 of those proceeds on various expenses, including the payment of taxes owed to the Internal Revenue Service, a manufactured home, a real estate down payment, and ultimately transferred the balance to a new brokerage account, opened in December 2007.

43.     No registration statement was filed or in effect as to these securities transactions described above.

### Sonfield Transfers Shares to Lane and Brewer, Who Promptly Re-sell Them.

44.     On four separate occasions between October 2005 and July 2006, Sonfield delivered a total of 19 of the original Kilis founders certificates and their accompanying signed stock powers to Exobox's transfer agent in Utah for cancellation and re-issuance as 8.5 million post-split Exobox shares.  Rather than having the Exobox shares re-issued in the names of the founding Kilis shareholders, Sonfield instructed the transfer agent to

re-issue the certificates in the names of nine offshore entities controlled by Lane and Brewer. Sonfield also delivered for re-issuance the certificates issued in June 2005 to the JinPin principal in June 2005 and to Landess' step-brother.

45.     Pursuant to Sonfield's instructions, the transfer agent cancelled the Kilis certificates and reissued the shares as Exobox certificates without restrictive legends in the names of nine different offshore entities, all controlled by or holding the shares for the benefit of, Lane and Brewer. Sonfield directed the transfer agent to deliver all of these certificates by overnight mail to Lane and Brewer's London-based attorney.

46.     These deliveries, representing the following percentages of Exobox common stock, occurred on the following dates:

- 35.19% on October 12 2005;
- 12.42% on February 17, 2006;
- 18.63% on July 10, 2006; and
- 12% on July 31, 2006.

47.     On instructions from Lane and Brewer, their London attorney deposited the Exobox certificates received from Exobox's transfer agent into four U.S. broker-dealers, in accounts opened in the names of eight offshore entities. Curiously, those deliveries to the U.S. brokerage accounts were staggered so that no account held more than 5% of Exobox's outstanding common stock at any one time.

48.     From March 9, 2006 through April 13, 2007, Lane and Brewer directed the sale of approximately 8 million Exobox shares from these accounts, reaping gross proceeds of approximately $2.78 million. All proceeds from these sales were transferred to overseas bank accounts either controlled or beneficially owned by Lane and Brewer.

From February to June 2006, approximately $1,152,780 in Exobox common stock sales proceeds were wired, on instruction of or for the benefit of Lane and Brewer, from their offshore entities' U.S. brokerage accounts to their foreign bank accounts, including in the United Kingdom.

49.     Neither Lane, nor Brewer, nor the off-shore entities filed notices of proposed sales under Securities Act Rule 144(h).  By mid-April 2006 Lane and Brewer's offshore entities had sold 128,458 shares, well-exceeding the 1% volume limitation of Rule 144(e)(1)(i).

50.     Lane and Brewer used a portion of their Exobox common stock sale proceeds to pay the $500,000 to Exobox in exchange for Exobox preferred stock pursuant as agreed with Exobox during the reverse merger negotiations.  Specifically, Lane and Brewer caused four payments, totaling $500,000, to be wired from the foreign bank accounts to Sonfield, who forwarded the funds to Exobox as installment payments required by the preferred stock purchase agreement.  At least $200,000 of these installment payments represented Exobox common stock sales proceeds.

51.     No registration statement was filed or in effect regarding these securities transactions described above.

### Unregistered, Nonexempt Distributions by the Bradleys and Landess

52.     On or about February 22, 2006, Don Bradley received three of the original Kilis share certificates that been issued in 2000, putatively in his name and that of his son and wife.  Following the stock split and reverse merger, these certificates represented approximately 1.2 million Exobox shares, or about 11% of Exobox's outstanding common stock.

53.     On March 1, 2006, in what was possibly an attempt to prevent the
Bradleys and Landess from selling their shares and undercutting Sonfield, Lane and
Brewer, who were selling shares they controlled, Sonfield instructed the transfer agent to
place a restrictive legend on the Bradleys' shares.  This action, of course, was expressly
contrary to Sonfield's October 7, 2005 tradability opinion letter,

54.     Landess responded by threatening to file suit against Sonfield, Exobox and
others if the restriction was not removed.  Indeed, he forwarded a draft complaint to
Sonfield and others that detailed the agreement between the Bradleys, Landess and
Sonfield, alleging, for example, that:

> ...all of the unrestricted shares then in Sonfield's possession (consisting of
> 10,867,500 shares) would be kept by Sonfield and his partners as consideration
> for doing the technical securities legal and corporate work necessary to "take the
> company public."  This pool of stock is commonly referred to as "the float."

The draft complaint also alleged that Sonfield and his partners had promised to tender
five percent (5%) of the float to the Bradleys and another five percent (5%) to Landess
after the consummation of the aforementioned merger.

55.     Landess' draft complaint confirms, in blunt detail, that the Bradleys
controlled all of the Kilis founders' certificates and that the Bradleys and Landess
conveyed control of those certificates to Sonfield in consideration for (a) Sonfield
arranging a reverse merger between Kilis and one of Sonfield's private company clients
and (b) Sonfield's promise to deliver 10% of the common stock of the merged entity to
the Bradleys and Landess.  Even in the face of the threatened lawsuit, Sonfield continued
to have the Kilis founders' certificates reissued as putatively "free trading" Exobox
shares in the names of entities controlled by Lane and Brewer and to have those reissued

certificates distributed to entities controlled by Lane and Brewer in unregistered, nonexempt transactions.

56.     Ultimately, on March 7, 2006, the dispute with the Bradleys and Landess was resolved when the shares were cancelled and reissued as unrestricted Exobox shares, in accordance with Donald Bradley's original instructions, to Donald Bradley, Jeff Bradley (and/or their nominees) and an entity controlled by Landess, and he refrained from filing his lawsuit.  The transfer agent reissued the shares after it received an opinion letter written by a Los Angeles attorney, relying on representations from the Bradleys, which indicated that the Bradleys' shares were indeed unrestricted pursuant to Rule 144(k).

57.     The Kilis shares the Bradleys gave up (as part of their original deal with Sonfield) in exchange for 10% of the outstanding shares of the surviving Exobox public company were returned to them only in February 2006.  Therefore, they had not held the securities for two years, as required by Rule 144(k).

58.     From April 21, 2006 through February 6, 2007, Donald and Jeff Bradley and their nominees received $204,354 from over-the-counter sales of 493,750 shares of Exobox common stock.  These sales exceeded the 1% volume limitation of Rule 144(e)(1)(i) beginning in June 2006.

59.     From March 21, 2006 through October 17, 2006, Landess and his nominee entity received $286,711 from over-the-counter sales of 593,750 shares of Exobox common stock.  These sales exceeded the 1% volume limitation of Rule 144(e)(1)(i) beginning June 2006.

60. No registration statement was filed or in effect regarding the securities transactions described above.

### *Sonfield Drafts and Files Public Filings that Fraudulently Conceals His and Lane and Brewer's Control of Exobox's Public Float*

61. On or about December 21, 2005, Sonfield prepared and filed a Form 10-SB registration statement, on behalf of Exobox, to register the company's common stock. On or about February 3, 2006, Sonfield filed a Form 10-SB/A to amend the registration statement. These filings contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. These materially false and misleading statements and omissions include: the failure to disclose that immediately after the reverse merger that resulted in Exobox, Sonfield controlled at least 9.6 million shares or 88% of the company's outstanding common stock and purportedly unrestricted float; the failure to disclose Sonfield's transfer of approximately 35% of Exobox's common stock to Lane and Brewer's entities, which they still held at that time; the failure to disclose Sonfield's agreement to provide 10% of the company's common stock to the Bradleys and to Landess. On or about February 19, 2006, the registration became effective.

62. On or about March 8 and 9, 2006, Sonfield prepared and filed two post-effective amendments to the Form 10-SB. Both amendments stated that "as of the closing date [of the Exobox merger], Exobox Nevada [JinPin, f/k/a Kilis] was a non-operating blank check or shell corporation controlled by Donald C. Bradley, his wife, Shirlene Bradley, and their son, Jeff Bradley." This statement is contrary to a statement in Sonfield's October 7, 2005 tradability opinion letter that the Bradleys "ceased to be

affiliates [of Kilis] on June 22, 2005," which was the date they, at Sonfield's direction,
formally appointed the JinPin principal as the company's sole officer and director in
connection with the failed Kilis/JinPin merger.

63.     This filing also contained untrue statements of material fact and omitted to
state material facts necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading by concealing Sonfield, Lane
and Brewer's control of the Kilis certificates and Sonfield's disposition of virtually all of
Exobox's common stock after the Exobox merger.  By the time Sonfield filed the Form
10-SB amendments in March, he had transferred 47.61% of Exobox's purportedly
unrestricted common stock to Lane and Brewer's off-shore entities, yet Sonfield failed to
report the entities' ownership when he drafted and filed the amendments to Exobox's
registration statement.

64.     In addition, the March 2006 Form 10-SB amendment continued to report,
as did the original and first amended Form 10-SB filings, that the principal of JinPin who
had been issued shares in June 2005, still owned 1,350,000 shares of Exobox common
stock, equal to 12.42% of the common shares then outstanding.  However, in reality,
Sonfield had directed sale of 300,000 of those shares to one of Lane and Brewer's
offshore entities in February 2006 and had received numerous blank stock powers signed,
at Sonfield's direction by the former JinPin principal, for the sale of the remaining
1,050,000 shares.

65.     On or about November 7, 2006, Sonfield prepared and filed Exobox's
Form 10-KSB for the fiscal year ended July 31, 2006.  Again, this filing contained untrue
statements of material fact and omitted to state material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading by failing to disclose that Lane and Brewer controlled the vast percentage of the company's common stock.

66.    By concealing the material fact that he, Lane and Brewer controlled and had beneficial ownership of reportable percentages of Exobox's common stock, Sonfield deprived investors of material information, including the facts that he, Lane and Brewer controlled the company's purportedly unrestricted common stock float and its market and that an apparent investor in preferred stock was actually a Lane and Brewer controlled entity.

67.    Sonfield prepared these public filings and caused them to be filed with the Commission, and he knew or was reckless in not knowing that each contained material omissions as described above, despite his duty to ensure that these public filings were accurate.

### Defendants Fail to File Ownership Reports

68.    As the result of Sonfield's Exobox certificate deliveries, Lane and Brewer, directly or indirectly, owned more than 10% of Exobox's outstanding common stock on February 19, 2006, when Exobox's Form 10-SB registration became effective. After the effective date, they acquired additional stock in amounts exceeding two per cent of the total outstanding common stock. Regardless, neither Lane, nor Brewer, nor any entity ever filed required reports on Schedule 13D or Forms 3 or 4 regarding their acquisition, ownership and sales of Exobox common stock.

69.    Sonfield's procurement of Kilis, his ability to cause Kilis to engage in the reverse merger, his control over the Kilis certificates, and subsequent control over the

Exobox certificates, plus his control over the Exobox stock transactions in the account of his legal assistant and Blankenship show his beneficial ownership and control of more than 10% of Exobox's outstanding common stock. Yet, Sonfield never filed any required reports on Schedule 13D or Forms 3 or 4 regarding his acquisition, ownership and sales of Exobox common stock.

### FIRST CLAIM
### Sonfield's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

70.    Plaintiff Commission hereby incorporates paragraphs 1 through 69 as if fully set forth herein.

71.    Defendant Sonfield, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails, and in violation of has: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

72.    Defendant Sonfield knowingly or recklessly engaged in the conduct described in this claim and did so in violation of his duties.

73.    By reason of the foregoing, Defendant Sonfield violated, and unless enjoined, will continue to violate the provisions of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM
### Violations of Sections 5(a) and 5(c) of the Securities Act

74.     Plaintiff Commission hereby incorporates paragraphs 1 through 69 as if fully set forth herein.

75.     Defendants Sonfield, Donald Bradley, Jeffrey Bradley, Landess, Lane and Brewer, directly or indirectly, singly or in concert with others: (a) without a registration statement in effect as to the securities, (i) made use of the means or instruments of transportation or communication or the mails to sell such securities through the use or medium of a prospectus or otherwise, or (ii) carried or caused to be carried through the mails, or in interstate commerce, by any means or instruments of transportation, such securities for the purpose of sale or for delivery after sale; and (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise securities for which a registration statement had not been filed as to such securities.

76.     By reason of the foregoing, Defendants Sonfield, Donald Bradley, Jeffrey Bradley, Landess, Lane and Brewer violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### THIRD CLAIM
### Sonfield's Aiding and Abetting Violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 Thereunder

77.     Plaintiff Commission hereby incorporates paragraphs 1 through 69 as if fully set forth herein.

78.     Exobox is a public company whose common stock is registered with the Commission and is required to file annual reports with the Commission in accordance with Section 13(a) of the Exchange Act and Rule 13a-1 thereunder.  Exchange Act Rule

12b-20 requires that such reports contain, in addition to disclosures expressly required by statute and rules, such other information as is necessary to ensure that the statements made are not, under the circumstances, misleading.

79.     Defendant Sonfield knowingly or recklessly substantially assisted the filing of false and misleading reports and forms with the Commission.

80.     By reason of the foregoing, defendant Sonfield has aided and abetted violations of, and unless enjoined, will continue to aid and abet violations of, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 [C.F.R. §§ 240.12b-20 and 13a-1].

### FOURTH CLAIM
### Violations by Lane and Brewer of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder

81.     Plaintiff Commission hereby incorporates paragraphs 1 through 69 as if fully set forth herein.

82.     Defendants Lane and Brewer had beneficial ownership of more than five percent of Exobox's outstanding shares of common stock by October 2005. Accordingly, they were required to file a Form 3 and Schedule 13D with the Commission, but failed to do so. Further, they failed to file Forms 4 notifying the Commission of changes in their Exobox securities holdings.

83.     By reason of the foregoing, defendants Lane and Brewer violated and, unless enjoined, will continue to violate Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

### FIFTH CLAIM
### Violations by Sonfield, Lane and Brewer of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder

84.     Plaintiff Commission hereby incorporates paragraphs 1 through 69 as if fully set forth herein.

85.     Defendants Sonfield, Lane and Brewer had beneficial ownership of more than 10% of Exobox's outstanding shares of common stock by at least October 2005. Exobox had a class of stock registered under Section 12 of the Exchange Act. Defendants Sonfield, Lane and Brewer were required to file Forms 3 with the Commission, but failed to do so. Further, defendants Sonfield, Lane and Brewer failed to file Forms 4 notifying the Commission of changes in their Exobox shareholdings. Accordingly, defendants Sonfield, Lane and Brewer violated Section 16(a) and Rule 16a-3 thereunder.

86.     By reason of the foregoing, defendants Sonfield, Lane and Brewer violated and, unless enjoined, will continue to violate Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

### SIXTH CLAIM
### Claim Against the Relief Defendant

87.     Plaintiff Commission hereby incorporates paragraphs 1 through 69 as if fully set forth herein.

88.     As set forth in this Complaint, Relief Defendant has received funds and assets from one or more of the Defendants, which are the proceeds of, or are traceable to the proceeds of, the unlawful activities of the Defendants as alleged above.

89.     Relief Defendant has obtained the funds and assets alleged above as part of an in furtherance of the securities violations alleged in paragraphs 1 through 69 and under the circumstances it is not just, equitable or conscionable for her to retain the funds and assets.  As a consequence, Relief Defendant Blankenship has been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

(1)     Permanently enjoining defendant Sonfield, and his agents, servants, employees, attorneys, and those in active concert or participation with it, who receive actual notice by personal service or otherwise, from violating Sections 5(a) and 5(c) of the Securities Act and Sections 10(b) and 16(a) of the Exchange Act and Rules 10b-5, and 16a-3 thereunder and from aiding and abetting violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder;

(2)     Permanently enjoining defendants Donald C. Bradley, Jeffrey W. Bradley and Jason Landess and their agents, servants, employees, attorneys, and those in active concert or participation with them, who receive actual notice by personal service or otherwise,  from violating Sections 5(a) and 5(c) of the Securities Act;

(3)     Permanently enjoining defendants Lane and Brewer, and their agents, servants, employees, attorneys, and those in active concert or participation with them, who receive actual notice by personal service or otherwise, from violating Sections 5(a) and 5(c) of the Securities Act and Sections 13(d) and 16(a) of the Exchange Act and Rules 13d-1 and 16a-3 thereunder;

(4)   Ordering defendants Sonfield, Donald Bradley, Jeffrey Bradley, Jason Landess, Marc Lane and Roger Brewer to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sonfield, Lane and Brewer to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(5)   Order all Defendants to disgorge an amount equal to the funds and benefits they obtained illegally as a result of the violations alleged herein, plus prejudgment interest on that amount, and order Relief Defendant Blankenship to disgorge any gains or proceeds she received that are connected to the conduct described above;

(6)   Permanently barring defendants Sonfield, Donald Bradley, Jeffrey Bradley, Jason Landess, Marc Lane and Roger Brewer from participating in an offering of penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and, as to Sonfield, Lane and Brewer, pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

(7)   Order any additional relief that this Court may deem just and proper.

DATED:  July 29, 2008

Respectfully submitted,

David B. Reece
Attorney in Charge
Texas Bar No. 24002810
S.D. Texas Bar No. 896560
Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, Texas  76102-6882
(817) 978-6476
(817) 978-4927 (fax)
reeced@sec.gov
ATTORNEY FOR PLAINTIFF

## EXHIBIT B



In Brownsville, U.S. District Judge Andrew Hanen again leads his district with the most civil case pending for more than three years: 153 for the third year in a row. All of those cases come with the same caveat: They're all border-fence condemnation cases.

In 2008, the U.S. Department of Homeland Security filed eminent-domain proceedings against hundreds of Texas landowners as part of a government project to build new sections of fence along the U.S.-Mexico border [See "Fenced In" Texas Lawyer, Jan. 9, 2010, page 1.]

The problem with those cases is determining exactly who owns the land the government wants to condemn. Some of the deed records through which the parties are sifting date back centuries, Hanen said, and they still don't resolve ownership issues.

"We're getting down the harder ones," he said.

In some disputes, the parties have asked Hanen to determine who owns the land the government wants to condemn, he said.

"I've got the first request actually asking me to make the determination comment.

## Western and Eastern Districts

In the Western District of Texas, only one judge had numbers in the double digits. U.S. District Judge Alia Moses of Del Rio reported 11 motions pending for more than six months. Moses, whose border docket consists mainly of criminal cases, could not be reached for comment.

Fred Biery, chief judge of the Western District of Texas, said judges in his district are doing the best they can to keep up with their dockets. He notes that the Western District is short one active judge in San Antonio and budget sequestration has hampered the district's ability to hire employees in the clerk's office.

"We're muddling through, and our vacancy in San Antonio is now in its sixth year," Biery said, noting that political progress is occurring in filling that bench.

But progress on appointments to the federal appellate bench could be bad news at the federal trial court level. U.S. District Judge Xavier Rodriguez in San Antonio "is mentioned for the Fifth Circuit, and, if that would happen, there would be another vacancy," Biery said [See "Then There Were Three: Committee Looking at a Trio of Texans for Fifth Circuit Spots" Texas Lawyer, Dec. 9, page 1.]

In the Eastern District of Texas, no judge reported double digits in either civil cases pending for more than three years or motions pending for more than six months.

That's no easy feat, considering that the district, which is comprised of eight active judges, has lost two of them to retirement, said Leonard Davis, Eastern District chief judge. Because the district overall has a light criminal case load, it attracts a large number of difficult patent and intellectual property cases, especially in the Marshall and Tyler divisions.

To deal with the vacancies, some active judges have taken on dockets in Sherman and Texarkana—the divisions with bench openings—to cover the load, Davis said. ◼◼◼

# THE 2013 SLOWPOKE REPORT

| | Civil Cases Pending Over Three Years | Number of Motions Pending Over Six Months |
|---|---|---|
| **NORTHERN DISTRICT** | | |
| Jane J. Boyle | 1 | 0 |
| Sam R. Cummings | 0 | 0 |
| A. Joe Fish* | 2 | 0 |
| Sidney A. Fitzwater** | 1 | 2 |
| David C. Godbey | 20 | 20 |
| James E. Kinkeade | 0 | 0 |
| Sam A. Lindsay | 2 | 1 |
| Barbara M.G. Lynn | 8 | 1 |
| John H. McBryde | 0 | 0 |
| Terry Means* | 1 | 0 |
| Reed O'Connor | 0 | 0 |
| Mary Lou Robinson | 0 | 0 |
| Jorge A. Solis | 5 | 2 |
| **Total** | **40** | **6** |
| | | |
| **SOUTHERN DISTRICT** | | |
| Micaela Alvarez | 0 | 0 |
| Nancy F. Atlas | 0 | 0 |
| Gregg Costa | 3 | 3 |
| Randy Crane | 1 | 0 |
| Keith P. Ellison | 9 | 0 |
| Marina Garcia Marmolejo | | |
| Vanessa D. Gilmore | 0 | 0 |
| Andrew S. Hanen | 153 | 0 |
| Melinda Harmon | 16 | 3 |
| Hayden Head* | 2 | 0 |
| Ricardo Hinojosa** | 9 | 5 |
| David Hittner* | 0 | 0 |
| Kenneth Hoyt | 4 | 0 |
| Lynn N. Hughes | 10 | 81 |
| Janis Graham Jack* | 0 | 0 |
| George P. Kazen* | 1 | 2 |
| Simeon T. Lake III | 3 | 0 |
| Gray H. Miller | 6 | 1 |
| John D. Rainey* | 3 | 0 |
| Nelva Gonzales Ramos | 0 | 1 |
| Lee H. Rosenthal | 1 | 3 |
| Diana Saldana | 2 | 0 |
| Hilda G. Tagle* | 3 | 1 |
| Ewing Werlein Jr.* | 0 | 4 |
| **Total** | **226** | **104** |
| | | |
| **EASTERN DISTRICT** | | |
| Ron Clark | 1 | 1 |
| Marcia A. Crone | 1 | 0 |
| Leonard E. Davis** | 3 | 1 |
| Rodney Gilstrap | 5 | 0 |
| Thad Heartfield* | 1 | 1 |
| Richard A. Schell | 9 | 0 |
| Michael H. Schneider Sr. | 0 | 0 |
| **Total** | **20** | **3** |
| | | |
| **WESTERN DISTRICT** | | |
| Fred Biery** | 0 | 0 |
| David Briones* | 0 | 1 |
| Kathleen Cardone | 0 | 0 |
| David Ezra* | 3 | 0 |
| Orlando L. Garcia | 3 | 2 |
| David C. Guaderrama | 0 | 0 |
| Harry Lee Hudspeth | 1 | 2 |
| Robert A. Junell | 1 | 0 |

## 4:08-cv-02351 SEC v. Sonfield et al
Lynn N. Hughes, presiding
**Date filed: 07/29/2008**
**Date of last filing: 01/03/2014**

# History −

EXHIBIT C

| Doc. No. | Dates | | Description |
|---|---|---|---|
| | *Filed & Entered:* | 01/03/2014 | ❍ Set/Reset Deadlines |
| | *Filed & Entered:* | 10/23/2013 | ❍ Set/Reset Deadlines |
| 138 | *Filed & Entered:* | 07/17/2013 | ❍ Response in Opposition to Motion |
| 137 | *Filed & Entered:* | 07/02/2013 | ❍ Response in Opposition to Motion |
| 136 | *Filed & Entered:* | 06/28/2013 | ❍ Motion for Miscellaneous Relief |
| | *Filed & Entered:* | 12/18/2012 | ❍ Set/Reset Deadlines |
| 135 | *Filed & Entered:* | 06/17/2011 | ❍ Response |
| 134 | *Filed & Entered:* | 06/16/2011 | ❍ Reply |
| 133 | *Filed:* *Entered:* | 06/13/2011 06/15/2011 | ❍ Order on Motion for Leave to File |
| 128 | *Filed & Entered:* | 05/27/2011 | ❍ Reply in Support of Motion |
| 129 | *Filed & Entered:* | 05/27/2011 | ❍ Response |
| 130 | *Filed & Entered:* | 05/27/2011 | ❍ Response |
| 131 | *Filed & Entered:* | 05/27/2011 | ❍ Motion to Strike |
| 132 | *Filed & Entered:* | 05/27/2011 | ❍ Reply to Response to Motion |
| 125 | *Filed & Entered:* | 05/19/2011 | ❍ Response |
| 126 | *Filed & Entered:* | 05/19/2011 | ❍ Proposed Order |
| 127 | *Filed & Entered:* | 05/19/2011 | ❍ Proposed Order |
| 124 | *Filed:* *Entered:* | 05/18/2011 05/19/2011 | ❍ Order |
| 119 | *Filed & Entered:* *Terminated:* | 05/12/2011 06/13/2011 | ❍ Motion for Leave to File Document |
| 120 | *Filed & Entered:* | 05/12/2011 | ❍ Reply to Response to Motion |
| 121 | *Filed & Entered:* | 05/12/2011 | ❍ Response to Motion |
| 122 | *Filed & Entered:* | 05/12/2011 | ❍ Response |
| 123 | *Filed:* *Entered:* | 05/12/2011 05/13/2011 | ❍ Motion to Strike |
| 118 | *Filed & Entered:* *Terminated:* | 05/05/2011 06/13/2011 | ❍ Motion for Leave to File Document |
| 116 | *Filed & Entered:* *Terminated:* | 04/28/2011 06/13/2011 | ❍ Motion for Leave to File Document |

| 117 | Filed & Entered: 04/28/2011 | ❶ Objections |
|-----|------------------------------|--------------|
| 109 | Filed & Entered: 04/21/2011 | ❶ Response in Opposition to Motion |
| 110 | Filed & Entered: 04/21/2011 | ❶ Response in Opposition to Motion |
| 111 | Filed & Entered: 04/21/2011 | ❶ Document |
| 112 | Filed & Entered: 04/21/2011 | ❶ Appendix |
| 113 | Filed & Entered: 04/21/2011 | ❶ Proposed Order |
| 114 | Filed & Entered: 04/21/2011 | ❶ Motion to Strike |
| 115 | Filed & Entered: 04/21/2011 | ❶ Response in Opposition to Motion |
| 108 | Filed & Entered: 04/01/2011 | ❶ Appendix |
| 102 | Filed & Entered: 03/31/2011 | ❶ Motion for Partial Summary Judgment |
| 103 | Filed & Entered: 03/31/2011 | ❶ Memorandum |
| 104 | Filed & Entered: 03/31/2011 | ❶ Motion for Summary Judgment |
| 105 | Filed & Entered: 03/31/2011 | ❶ Appendix |
| 106 | Filed & Entered: 03/31/2011 | ❶ Appendix |
| 107 | Filed & Entered: 03/31/2011 | ❶ Motion for Partial Summary Judgment |
| 100 | Filed: 03/17/2011 Entered: 03/19/2011 | ❶ Judgment |
| 101 | Filed: 03/17/2011 Entered: 03/19/2011 | ❶ Judgment |
| 98 | Filed: 02/16/2011 Entered: 02/22/2011 | ❶ Mail Returned Undeliverable |
| 99 | Filed: 02/16/2011 Entered: 02/22/2011 | ❶ Mail Returned Undeliverable |
| 97 | Filed & Entered: 02/07/2011 | ❶ Order |
| 96 | Filed & Entered: 02/04/2011 Terminated: 02/07/2011 | ❶ Motion for Extension of Time |
| 95 | Filed & Entered: 02/02/2011 Terminated: 03/17/2011 | ❶ Motion for Judgment |
| 94 | Filed: 01/21/2011 Entered: 01/24/2011 | ❶ Order |
| 93 | Filed & Entered: 01/19/2011 | ❶ Status Report |
| 92 | Filed & Entered: 01/14/2011 | ❶ Response |
| 91 | Filed & Entered: 01/13/2011 | ❶ Response |
| 89 | Filed: 01/04/2011 Entered: 01/05/2011 | ❶ Conference Memorandum |
| 90 | Filed: 01/04/2011 Entered: 01/05/2011 | ❶ Scheduling Order |
| 87 | Filed: 12/06/2010 Entered: 12/09/2010 | ❶ Mail Returned Undeliverable |
| 88 | Filed: 12/06/2010 Entered: 12/09/2010 | ❶ Mail Returned Undeliverable |

| 86 | Filed & Entered: | 11/23/2010 | Order Setting Conference |
|----|----|----|----|
| 85 | Filed:<br>Entered: | 04/08/2010<br>04/09/2010 | Order on Motion to Withdraw as Attorney |
| 84 | Filed & Entered:<br>Terminated: | 04/06/2010<br>04/08/2010 | Motion to Withdraw as Attorney |
| 83 | Filed & Entered: | 12/21/2009 | Statement |
|    | Filed & Entered: | 11/18/2009 | Set/Reset Deadlines |
| 82 | Filed:<br>Entered: | 11/17/2009<br>11/18/2009 | Conference Memorandum |
| 81 | Filed & Entered: | 11/16/2009 | Response |
| 80 | Filed:<br>Entered: | 11/04/2009<br>11/09/2009 | Conference Memorandum |
| 79 | Filed & Entered: | 11/02/2009 | Order Resetting Conference |
|    | Filed & Entered: | 10/02/2009 | Terminate Deadlines |
| 78 | Filed & Entered: | 09/23/2009 | Order Setting Conference |
| 77 | Filed:<br>Entered: | 08/05/2009<br>08/07/2009 | Order on Motion for Default Judgment |
| 75 | Filed & Entered: | 07/28/2009 | Clerks Entry of Default |
| 76 | Filed & Entered: | 07/28/2009 | Clerks Entry of Default |
| 67 | Filed & Entered: | 07/27/2009 | Request for Entry of Default |
| 68 | Filed & Entered:<br>Terminated: | 07/27/2009<br>08/03/2009 | Motion for Miscellaneous Relief |
| 69 | Filed & Entered:<br>Terminated: | 07/27/2009<br>08/05/2009 | Motion for Default Judgment |
| 70 | Filed & Entered: | 07/27/2009 | Declaration |
| 71 | Filed & Entered: | 07/27/2009 | Request for Entry of Default |
| 72 | Filed & Entered:<br>Terminated: | 07/27/2009<br>08/03/2009 | Motion for Miscellaneous Relief |
| 73 | Filed & Entered:<br>Terminated: | 07/27/2009<br>08/05/2009 | Motion for Default Judgment |
| 74 | Filed & Entered: | 07/27/2009 | Declaration |
|    | Filed:<br>Entered: | 07/20/2009<br>07/21/2009 | Set/Reset Deadlines |
| 66 | Filed:<br>Entered: | 07/20/2009<br>07/21/2009 | Conference Memorandum |
| 64 | Filed & Entered: | 06/29/2009 | Return of Service Executed |
| 65 | Filed & Entered: | 06/29/2009 | Return of Service Executed |
| 62 | Filed & Entered: | 06/23/2009 | Letter |
| 63 | Filed & Entered: | 06/23/2009 | Order Resetting Conference |
| 61 | Filed & Entered: | 06/18/2009 | Notice (Other) |
| 56 | Filed & Entered: | 05/18/2009 | Motion to Withdraw as Attorney |

Case 4:08-cv-02351  Document 139  Filed in TXSD on 10/07/14  Page 37 of 40

| | | Terminated: | 12/02/2008 | |
|---|---|---|---|---|
| [32](#) | Filed & Entered: | 11/25/2008 | 🔵 Affidavit |
| [30](#) | Filed & Entered: | 11/14/2008 | 🔵 Order on Motion to Dismiss |
| [29](#) | Filed & Entered: | 11/07/2008 | 🔵 Answer to Complaint |
| [28](#) | Filed & Entered: | 10/30/2008 | 🔵 Motion for Miscellaneous Relief |
| | Terminated: | 11/14/2008 | |
| | Filed & Entered: | 10/29/2008 | 🔵 Scheduling Conference |
| [27](#) | Filed & Entered: | 10/29/2008 | 🔵 Scheduling Order |
| [26](#) | Filed & Entered: | 10/23/2008 | 🔵 Motion to Dismiss |
| | Terminated: | 11/14/2008 | |
| [25](#) | Filed & Entered: | 10/16/2008 | 🔵 Reply to Response to Motion |
| [24](#) | Filed & Entered: | 10/15/2008 | 🔵 Document |
| [22](#) | Filed & Entered: | 10/10/2008 | 🔵 JointDiscovery/Case Management Plan |
| [23](#) | Filed & Entered: | 10/10/2008 | 🔵 Answer to Complaint |
| [20](#) | Filed & Entered: | 10/01/2008 | 🔵 Response in Opposition to Motion |
| [21](#) | Filed: | 10/01/2008 | 🔵 Notice of Appearance |
| | Entered: | 10/03/2008 | |
| [19](#) | Filed & Entered: | 09/30/2008 | 🔵 Order on Motion for Leave to File |
| [18](#) | Filed & Entered: | 09/29/2008 | 🔵 Motion for Leave to File Document |
| | Terminated: | 09/30/2008 | |
| [17](#) | Filed & Entered: | 09/26/2008 | 🔵 Order on Motion for Extension of Time |
| [15](#) | Filed & Entered: | 09/25/2008 | 🔵 Motion for Extension of Time |
| | Terminated: | 09/26/2008 | |
| [16](#) | Filed & Entered: | 09/25/2008 | 🔵 Affidavit |
| [14](#) | Filed & Entered: | 09/23/2008 | 🔵 Stipulation |
| [13](#) | Filed & Entered: | 09/19/2008 | 🔵 Return of Service Executed |
| [12](#) | Filed & Entered: | 09/11/2008 | 🔵 Motion to Dismiss |
| | Terminated: | 03/23/2009 | |
| [10](#) | Filed & Entered: | 08/22/2008 | 🔵 Order for Initial Conference and Disclosure |
| [11](#) | Filed & Entered: | 08/22/2008 | 🔵 Answer to Complaint |
| [9](#) | Filed & Entered: | 08/13/2008 | 🔵 Waiver of Service Executed |
| [8](#) | Filed & Entered: | 08/12/2008 | 🔵 General Reference to Magistrate Judge |
| [5](#) | Filed & Entered: | 08/08/2008 | 🔵 Return of Service Executed |
| [6](#) | Filed & Entered: | 08/08/2008 | 🔵 Return of Service Executed |
| [7](#) | Filed & Entered: | 08/08/2008 | 🔵 Return of Service Executed |
| | Filed & Entered: | 08/07/2008 | 🔵 Summons Issued/Not Issued |
| [4](#) | Filed & Entered: | 08/07/2008 | 🔵 Waiver of Service Executed |
| [3](#) | Filed & Entered: | 07/31/2008 | 🔵 Order for Conference-FORMS-Judge Hughes |
| | Filed & Entered: | 07/30/2008 | 🔵 Summons Issued/Not Issued |
| [1](#) | Filed & Entered: | 07/29/2008 | 🔵 Complaint |

| 2 | *Filed & Entered:* 07/29/2008 ◑ Certificate of Interested Parties |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/24/2014 18:09:37 | | |
| **PACER Login:** | lf1558:3369455:0 | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 4:08-cv-02351 |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

| | | | |
|---|---|---|---|
| | *Terminated:* | 05/18/2009 | |
| 58 | *Filed:*<br>*Entered:* | 05/18/2009<br>05/20/2009 | Conference Memorandum |
| 59 | *Filed:*<br>*Entered:* | 05/18/2009<br>05/20/2009 | Order |
| 60 | *Filed:*<br>*Entered:* | 05/18/2009<br>05/20/2009 | Order on Motion to Withdraw as Attorney |
| 55 | *Filed & Entered:*<br>*Terminated:* | 05/15/2009<br>08/03/2009 | Motion for Leave to Appear |
| 57 | *Filed:*<br>*Entered:* | 05/14/2009<br>05/19/2009 | Letter |
| 53 | *Filed & Entered:* | 04/22/2009 | Letter |
| 52 | *Filed & Entered:* | 04/20/2009 | Notice (Other) |
| 51 | *Filed & Entered:* | 04/17/2009 | Response in Opposition to Motion |
| | *Filed:*<br>*Entered:* | 04/16/2009<br>04/30/2009 | Terminate Deadlines |
| 54 | *Filed:*<br>*Entered:* | 04/16/2009<br>04/30/2009 | Conference Memorandum |
| 50 | *Filed & Entered:* | 04/10/2009 | Letter |
| 49 | *Filed & Entered:* | 04/06/2009 | Answer to Complaint |
| 47 | *Filed & Entered:* | 04/03/2009 | Order Setting Conference |
| 48 | *Filed & Entered:* | 04/03/2009 | Notice (Other) |
| 46 | *Filed & Entered:* | 04/02/2009 | Order of Recusal |
| 45 | *Filed & Entered:*<br>*Terminated:* | 03/30/2009<br>04/22/2009 | Motion to Quash |
| 43 | *Filed & Entered:* | 03/23/2009 | Response |
| 44 | *Filed:*<br>*Entered:* | 03/23/2009<br>03/24/2009 | Order Adopting Memorandum and Recommendations |
| 42 | *Filed & Entered:* | 03/09/2009 | Objections to Memorandum and Recommendations |
| 41 | *Filed & Entered:* | 03/03/2009 | Order on Motion for Miscellaneous Relief |
| 40 | *Filed & Entered:* | 03/02/2009 | Memorandum and Recommendations |
| 38 | *Filed & Entered:*<br>*Terminated:* | 02/27/2009<br>03/03/2009 | Motion for Miscellaneous Relief |
| 39 | *Filed & Entered:* | 02/27/2009 | Declaration |
| 37 | *Filed & Entered:* | 01/26/2009 | Order on Motion for Extension of Time |
| 35 | *Filed & Entered:*<br>*Terminated:* | 01/23/2009<br>01/26/2009 | Motion for Extension of Time |
| 36 | *Filed & Entered:* | 01/23/2009 | Declaration |
| 34 | *Filed & Entered:* | 01/16/2009 | Return of Service Executed |
| 33 | *Filed & Entered:* | 12/02/2008 | Order on Motion for Extension of Time |
| 31 | *Filed & Entered:* | 11/25/2008 | Motion for Extension of Time |

